IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF NEW YORK

_____

MICHELE PEART,

                Plaintiff,

      vs.                                Civil Action No.
                                      1:04-CV-1271 (DNH/DEP)

COMMISSIONER OF SOCIAL SECURITY,

                Defendant.

_____

APPEARANCES:                     OF COUNSEL:

FOR PLAINTIFF:

GREATER UPSTATE LAW PROJECT  LOUISE TARANTINO, ESQ.
119 Washington Avenue
Albany, New York 12210

FOR DEFENDANT:

HON. GLENN T. SUDDABY        WILLIAM H. PEASE, ESQ.
United States Attorney            Assistant U.S. Attorney
Northern District of New York
P.O. Box 7198
100 S. Clinton Street
Syracuse, New York 13261-7198

DAVID E. PEEBLES
U.S. MAGISTRATE JUDGE

## REPORT AND RECOMMENDATION

Plaintiff Michele Peart, who suffers from an array of potentially

limiting physical and mental conditions, including principally chronic fatigue syndrome, depression, and anxiety, has commenced this proceeding seeking judicial review of the denial of her application for disability insurance and supplemental security income ("SSI") benefits under the Social Security Act.  In support of her challenge, plaintiff maintains that the administrative law judge ("ALJ") who heard and decided the matter at the agency level improperly rejected her testimony regarding the fatigue, pain, and other limitations which she experiences due to her conditions, and that the Commissioner's determination, which turns upon a finding that during the period at issue she retained the residual functional capacity ("RFC") to perform light work with some restrictions, is not supported by substantial evidence in the record.  Plaintiff further argues that the ALJ erred in applying the medical-vocational guidelines (the "grid") set forth in the agency's regulations, 20 C.F.R. Pt. 404, Subpt. P App. 2, to support a finding that she is not disabled, and instead should have elicited testimony from a vocational expert to determine whether she is capable of performing jobs existing in the national economy.

Having carefully reviewed the record now before the court, I find that the ALJ improperly discounted plaintiff's subjective complaints, and that

2

his credibility determination thus is not supported by substantial evidence. I further find that the ALJ's RFC determination as to plaintiff's ability to perform the exertional requirements of light work is not supported by substantial evidence.  Lastly, I find that the ALJ erred by failing to adduce testimony from a vocational expert or to receive other evidence in order to satisfy the Commissioner's burden of establishing the existence of jobs in the national economy for an individual with plaintiff's combination of exertional and nonexertional impairments.  I therefore recommend reversal of the determination of no disability, and a remand of the matter to the agency for further proceedings consistent with these findings.

I.      BACKGROUND

        Plaintiff was born on November 22, 1956; at the time of the administrative hearing, she was forty-six years old.  Administrative Transcript at pp. 29, 77.[1]  During the period at issue, plaintiff resided in Rennselaer, New York with her husband; at times, plaintiff's daughter and great-niece also resided there with them.[2]  AT 29, 48.  Plaintiff attended

_____

[1]      Portions of the administrative transcript, Dkt. No. 6, which was filed by the Commissioner together with the agency's answer, will be cited as "AT ___."

[2]      Plaintiff testified at the hearing that she gave up custody of her great-niece and that "in the last two months" her daughter had moved out.  AT 48-49.  It should also be noted that in a prior written submission to the agency, plaintiff stated that she also had custody of a great-nephew.  *See* AT 99.

3

high school, completing the eleventh grade, and later obtained her general

equivalency diploma ("GED").  AT 30-31.

Plaintiff last regularly worked in December 2001 as a part-time

substitute school bus driver.[3]  AT 33, 34.  Prior to her employment as a

bus driver, plaintiff worked in various other positions, including as a claims

analyst in a medical center business office, a school kitchen aide, a retail

sales clerk, and a floor clerk at a hospital.  AT 34, 90, 111.

Over time, dating back to at least 1997, plaintiff has registered

complaints of pain and fatigue, as well as depression.  AT 35, 89, 168,

171-73.  Plaintiff sought and received treatment from professionals at the

Albany Medical Center Family Practice Clinic for her symptoms between

1997 and 1999.  AT 143-173.  During that period, personnel at the Clinic

treated plaintiff's symptoms through a variety of means, including by such

medications as Paxil, Zoloft, Flexeril, Wellbutrin, Norflex and Darvocet.  *Id.*

Plaintiff began treating with Nurse Jan Whalen and others at the

Whitney Young Health Center beginning in 2000.  AT 202-213.  After

_____

[3]      Plaintiff testified during the administrative hearing that she stopped
working in December 2001, and did not work in January 2002, but that she "tried to go
back a couple [of] times in February [2002]."  AT 33.  In a prior written submission to
the agency, plaintiff stated that she worked one day in January of 2002 and "one or
two" days in February of that year.  AT 120.

4

reporting having experienced anxiety and periods of extreme fatigue, *see* AT 209, plaintiff was referred for testing, ultimately performed on June 6, 2000, for the presence of Epstein-Barr virus markers; that testing yielded "equivocal results" and "no definitive interpretation" could be made.[4]  AT 191.  Plaintiff was subsequently diagnosed on March 7, 2002 by Dr. John Morris, from Center Health Care, as suffering from chronic fatigue syndrome ("CFS") and depression.  AT 214-215.

On October 22, 2002, plaintiff was seen as a new patient by Dr. Betsy Fuchs, a rheumatologist.  AT 286.  Based upon physical observations recorded during that and subsequent visits, and laboratory testing of her blood levels, Dr. Fuchs was unable to determine the etiology of plaintiff's history of fatigue complaints, but concluded that she did not "believe it is related to any specific connective tissue process."  AT 284-285.

In addition to CFS, plaintiff reports that she suffers from depression

---

[4]    According to one authoritative medical source, Epstein-Barr virus is a virus of the genus *Lymphocryptovirus* that causes infectious mononucleosis and is associated with Burkitt's lymphoma and nasopharyngeal carcinoma.  *Dorland's Illustrated Medical Dictionary* 2044 (30th ed. 2003).

 Elevated levels of Epstein-Barr antibodies are among the few laboratory results that might support a diagnosis of chronic fatigue syndrome.  *See* SSR 99-2p, 1999 WL 271569, at *3 (S.S.A.).

and anxiety.  AT 89.  Beginning on September 16, 2002, plaintiff was

hospitalized at Samaritan Hospital, located in Troy, New York, for two

weeks, complaining of fatigue, depression, and suicidal ideation.  AT 312.

Upon her discharge, plaintiff was diagnosed as suffering from major

depressive disorder, and was prescribed various medications.[5],[6]  AT 312,

313.  In his discharge report, Dr. Adrian Morris noted that plaintiff

expressed concern "about what the medication would do to her brain" and

that plaintiff "continues to ruminate about the medications with limited

insight into the role and so, will probably be at risk for stopping them again

and noncompliance."  AT 313.

From October 2002 to June 2003, plaintiff sought treatment for her

depression and anxiety at Samaritan Hospital's outpatient clinic.  AT 292-

---

[5]     Upon her admission into Samaritan Hospital, plaintiff was diagnosed as
suffering from a "[m]ajor depressive disorder, recurrent."  AT 315.

[6]     According to one generally accepted authoritative source, major depressive
disorder is characterized by one or more major depressive episodes. *Diagnostic and
Statistical Manual of Mental Disorders* 369 (American Psychiatric Association, 4th Ed.
Text Revision 2000) ("DSM-IV-TR") at p. 369.  That source explains that a major
depressive episode occurs when at least five of certain specified symptoms are
present almost every day, over a two week period, including 1) depressed mood most
of the day; 2) markedly diminished interest in activities; 3) significant weight loss or
weight gain; 4) insomnia or hypersomnia; 5) psychomotor agitation or retardation; 6)
fatigue or loss of energy; 7) feelings of worthlessness or excessive, inappropriate guilt;
8) diminished ability to think or concentrate, or indecisiveness; 9) recurrent thoughts of
death; and 10) where the symptoms cause clinically significant distress or impairment
in social, occupational, or other areas of function.  *Id.* at 356.

6

309.  During the course of that treatment plaintiff reported experiencing symptoms which were determined to be consistent with a diagnosis of either major depressive disorder or panic attacks.[7]  AT 295.  Plaintiff was treated during that period with Effexor which, she testified, helps with her "compulsive worrying."  AT 37-38, 301-302.

Plaintiff also claims to experience pain in her back, hip, groin and pelvic area.  AT 43, 46.  On July 18, 2002, plaintiff visited orthopedist Dr. Neil Colman, complaining of back pain.  AT 277.  Dr. Colman noted that x-rays of plaintiff's lumbar spine were "remarkably good with little in the way of disc degeneration or arthritic changes."  *Id.*  Dr. Colman concluded that plaintiff's back pain was "most consistent with a spinal instability", recommending that she undergo physical therapy and referring her for "range of motion and strengthening of her back."  *Id.*

Between February and April of 2003, plaintiff's rheumatologist, Dr. Fuchs, ordered an x-ray of her right hip in order to help evaluate her complaints of experiencing "discomfort" in her low back and right groin. AT 284, 288.  On April 22, 2003 Dr. Fuchs concluded that the x-ray

_____

[7]      It is unclear precisely who at the Samaritan Hospital Outpatient Clinic was primarily responsible for plaintiff's care and treatment.  At the hearing, plaintiff testified that she was being treated by a Dr. Berger who, she stated, is a psychiatrist, although it is Dr. Norelli who prescribes her medications.  AT 36, 38.

showed evidence of moderate osteitis pubis, but was otherwise

unremarkable.  AT 284.  Dr. Fuchs noted that she spoke to plaintiff about

the possibility of taking an anti-inflammatory medication, but that plaintiff

did not feel that her condition was severe enough.  *Id.*  Dr. Fuchs

therefore recommended that plaintiff take baby aspirin and return in one

year.  AT 284-285.

During the hearing, plaintiff stated that she had experienced pain in

the hip and groin for the prior two years, while the pain in her pelvic area

had occurred only in "the last couple months."  AT 44.  Plaintiff also stated

that the pain became so severe that she had to use a cane.  *Id.*  Plaintiff

further claimed that when she "can't take" her back pain, she takes

Flexeril but only when the pain is "real severe" because the medication

causes her to experience "too much fatigue."  AT 37.  Otherwise, she

stated, she takes "Motrin, Advil, Tylenol, whatever's on sale that week,"

uses heating pads, and tries to stretch.  AT 45, 47.

In addition to receiving the various foregoing treatment for her

physical and mental conditions, plaintiff has been examined consultatively

on several occasions.  At the request of the agency, Dr. Christine Pocha

conducted an internal medicine examination of plaintiff on September 4,

2003.  AT 326-335.  Dr. Pocha diagnosed the plaintiff as suffering from various conditions, including, *inter alia*, CFS, lower back and right hip pain, depression/anxiety, and sleep apnea, reflecting a prognosis of "[f]air."  AT 330, 331.  Dr. Pocha opined that plaintiff has no limitations with respect to walking, standing, or sitting, as long as she is permitted to perform these activities at her own pace.  AT 331.  Dr. Pocha also concluded that plaintiff should be limited from carrying and lifting "heavy objects," *id.,* clarifying in an accompanying medical source statement that plaintiff should not lift and/or carry more than ten pounds.  AT 331-332.

Plaintiff was psychiatrically evaluated, again at the agency's initiative, by Dr. Annette Payne on April 25, 2002.  AT 217-221.  Based upon her evaluation, Dr. Payne offered an Axis I diagnosis of dysthymic disorder and generalized anxiety disorder.  AT 220.  Dr. Payne opined that plaintiff can follow and understand simple directions and instructions; perform simple, rote tasks under supervision; learn new tasks; and make appropriate decisions.  AT 219-220.  Dr. Payne also found, however, that plaintiff experiences difficulties with attention, concentration, performing complex tasks, relating with others, and dealing with the "normal stresses of a competitive workplace."  AT 220.  Dr. Payne concluded that plaintiff's

"psychiatric difficulties were mildly to moderately limiting." *Id.*

On May 28, 2002, Dr. Arlene Reed-Delaney, a non-examining State agency physician, completed a Mental RFC Assessment, reflecting that plaintiff is moderately limited with regard to some mental abilities, but not significantly limited with respect to many other mental abilities.  AT 237-238.  Dr. Reed-Delaney also found that plaintiff retained the ability to perform "low contact work," understand and follow directions, relate to others appropriately, and complete tasks independently.  AT 239-240.

The record also contains a physical RFC assessment, dated June 3, 2002, completed by an individual whose signature is illegible.[8]  AT 241-248.  That RFC assessment indicates that plaintiff has the ability to lift and/or carry up to twenty pounds occasionally; to lift and/or carry up to ten pounds frequently; and to stand and/or walk, and to sit, for about six hours in an eight hour workday, with no limitations regarding the ability to push or pull.  AT 242.

II.    PROCEDURAL HISTORY

    A.    Proceedings Before The Agency

---

[8]    A comparison of handwriting contained in various documents within the record suggests that the RFC assessment may have been completed by Mary Ray, a Disability Analyst with the New York State Office of Temporary and Disability Assistance.  *Compare* AT 222 *with* AT 241-248.

Plaintiff filed an application for disability insurance and SSI benefits on March 8, 2002, alleging a disability onset date of December 14, 2001. AT 77-79, 88-97.  That application was denied on June 5, 2002.  AT 52-57.

At plaintiff's request, a hearing was conducted on July 8, 2003 before ALJ Carl E. Stephan to address her challenge to the denial of benefits.  AT 26-49.  Following that hearing, during which plaintiff was represented by counsel, ALJ Stephan issued a determination dated October 15, 2003, finding that plaintiff was not disabled at the relevant times, and thus upholding the denial of her application of benefits.  AT 13-25.

In his decision, ALJ Stephan applied the familiar, five step sequential analysis to determine the issue of disability.  After concluding at step one that plaintiff did not engage in any substantial gainful activity during the relevant period, ALJ Stephan next proceeded to analyze the medical evidence, concluding at steps two and three that plaintiff suffers from mental and musculoskeletal impairments and fatigue of sufficiency severity as to limit her ability to perform basic work functions, but concluded that those impairments do not meet or equal any of the

presumptively disabling conditions listed in the governing regulations, *see*

20 C.F.R. Pt. 404, Subpt. P, App. 1, including specifically "the new

musculoskeletal listings."[9]  AT 17.

Based upon his review of the evidence in the record, ALJ Stephan

next concluded that plaintiff retains the RFC to perform simple, low stress

work at the light work exertional level which would not require constant

contact with others.[10]  AT 24.  ALJ Stephan also concluded that plaintiff's

condition imposes further limitations, finding that plaintiff is incapable of

_____

[9]      In his decision, ALJ Stephan also noted plaintiff's history of treatment for sleep apnea and Graves disease, but found that those conditions were not sufficiently severe for purposes of the disability analysis.  AT 17-18.  Plaintiff does not challenge this portion of the ALJ's determination.

[10]     By regulation, light work is defined as follows:

> Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time.

20 C.F.R. § 404.1567(b).

12

performing detailed or complex work and should "avoid frequent bending and significant lifting."  AT 23.  In arriving at his RFC determination the ALJ considered plaintiff's subjective complaints regarding limitations on her ability to work, and found them not to be fully credible given the medical evidence in the record, including the sporadic nature of her visits seeking medical treatment, the extent of her activities, and his belief that she did not treat her pain with other than non-prescription medication.  AT 23-24.

Applying his RFC findings, ALJ Stephan concluded at step four that plaintiff is unable to perform her past relevant work as a claims analyst in light of the nonexertional requirements associated with that position.[11]  AT 22.  Proceeding to step five, and resorting to use of the grid as a framework, the ALJ found that there are a significant number of jobs in the national economy that plaintiff can perform.  AT 25.  The ALJ thus concluded that plaintiff is not disabled within the meaning of the Act.  *Id.*

---

[11]    Plaintiff has described her duties in that claims analyst position as involving in-patient billing, following up on patient claims, balancing "daily cash," calling insurance companies, and using a computer to type and edit patient accounts and reports.  AT 34, 90, 113.  In his decision, ALJ Stephan concluded that plaintiff's mental impairment would preclude her performance of such detailed work and that her anxiety would limit her ability to perform in an environment where she would have constant contact with others.  AT 22-23.

ALJ Stephan's decision became a final determination of the agency when, on September 14, 2004, the Social Security Administration Appeals Council denied plaintiff's request for review.  AT 3-5.

> B.   This Action

Plaintiff commenced this action on November 1, 2004.  Dkt. No. 1. Issue was thereafter joined by the Commissioner's filing of an answer, accompanied by an administrative transcript of the evidence and proceedings before the agency, on February 25, 2005.  Dkt. Nos. 5, 6. With the filing of plaintiff's brief on May 25, 2005, Dkt. No. 9, and a brief on behalf of the Commissioner on July 6, 2005, Dkt. No. 11, this matter is now ripe for determination, and has been referred to me for the issuance of a report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) and Northern District of New York Local Rule 72.3(d).[12]  *See also* Fed. R. Civ. P. 72(b).

III.   DISCUSSION

---

[12]   This matter has been treated in accordance with the procedures set forth in General Order No. 18 (formerly, General Order No. 43) which was issued by the Hon. Ralph W. Smith, Jr., then-Chief United States Magistrate Judge, on January 28, 1998, and subsequently amended and reissued by then-Chief District Judge Frederick J. Scullin, Jr., on September 12, 2003.  Under that General Order an action such as this is considered procedurally, once issue has been joined, as if cross-motions for judgment on the pleadings had been filed pursuant to Rule 12(c) of the Federal Rules of Civil Procedure.

A.    Scope Of Review

A court's review under 42 U.S.C. § 405(g) of a final decision by the Commissioner is limited; that review requires a determination of whether the correct legal standards were applied, and whether the decision is supported by substantial evidence. *Veino v. Barnhart*, 312 F.3d 578, 586 (2d Cir. 2002); *Shaw v. Chater*, 221 F.3d 126, 131 (2d Cir. 2000); *Schaal v. Apfel*, 134 F.3d 496, 501 (2d Cir. 1998); *Martone v. Apfel*, 70 F.Supp.2d 145, 148 (N.D.N.Y. 1999) (Hurd, J.) (citing *Johnson v. Bowen*, 817 F.2d 983, 985 (2d Cir. 1987)).  Where there is reasonable doubt as to whether the Commissioner applied the proper legal standards, her decision should not be affirmed even though the ultimate conclusion reached is arguably supported by substantial evidence. *Martone*, 70 F. Supp.2d at 148.  If, however, the correct legal standards have been applied and the ALJ's findings are supported by substantial evidence, those findings are conclusive, and the decision should withstand judicial scrutiny regardless of whether the reviewing court might have reached a contrary result if acting as the trier of fact. *Veino*, 312 F.3d at 586; *Williams v. Bowen*, 859 F.2d 255, 258 (2d Cir. 1988); *Barnett v. Apfel*, 13 F. Supp.2d 312, 314 (N.D.N.Y. 1998) (Hurd, M.J.); *see also* 42 U.S.C. § 405(g).

15

The term "substantial evidence" has been defined as "'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Richardson v. Perales*, 402 U.S. 389, 401, 91 S. Ct. 1420, 1427 (1971) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229, 59 S. Ct. 206, 217 (1938)).  To be substantial, there must be "'more than a mere scintilla'" of evidence scattered throughout the administrative record.  *Id.*; *Martone*, 70 F. Supp.2d at 148 (citing *Richardson*, 402 U.S. at 401, 91 S. Ct. at 1427).  "To determine on appeal whether an ALJ's findings are supported by substantial evidence, a reviewing court considers the whole record, examining the evidence from both sides, because an analysis of the substantiality of the evidence must also include that which detracts from its weight." *Williams*, 859 F.2d at 258 (citing *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488, 715 S. Ct. 456, 464 (1951)).

When a reviewing court concludes that incorrect legal standards have been applied, and/or that substantial evidence does not support the agency's determination, the agency's decision should be reversed.  42 U.S.C. § 405(g); *see Martone*, 70 F. Supp.2d at 148.  In such a case the court may remand the matter to the Commissioner under sentence four of

16

42 U.S.C. § 405(g), particularly if deemed necessary to allow the ALJ to develop a full and fair record or to explain his or her reasoning.  *Martone*, 70 F. Supp.2d at 148 (citing *Parker v. Harris*, 626 F.2d 225, 235 (2d Cir. 1980)).  A remand pursuant to sentence six of section 405(g) is warranted if new, non-cumulative evidence proffered to the district court should be considered at the agency level.  *See Lisa v. Sec. of Dep't of Health & Human Servs. of U.S.*, 940 F.2d 40, 43 (2d Cir. 1991).  Reversal without remand, while unusual, is appropriate when there is "persuasive proof of disability" in the record and it would serve no useful purpose to remand the matter for further proceedings before the agency.  *Parker*, 626 F.2d at 235; *Simmons v. U.S. R.R. Ret. Bd.*, 982 F.2d 49, 57 (2d Cir. 1992); *Carroll v. Sec. of Health & Human Servs.*, 705 F.2d 638, 644 (2d Cir. 1983).

  B. <u>Disability Determination - The Five Step Evaluation Process</u>

  The Social Security Act defines "disability" to include the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months[.] "  42 U.S.C. §

423(d)(1)(A).  In addition, the Act requires that a claimant's

> physical or mental impairment or impairments [must
> be] of such severity that he is not only unable to do
> his previous work but cannot, considering his age,
> education, and work experience, engage in any other
> kind of substantial gainful work which exists in the
> national economy, regardless of whether such work
> exists in the immediate area in which he lives, or
> whether a specific job vacancy exists for him, or
> whether he would be hired if he applied for work.

*Id.* § 423(d)(2)(A).

The agency has prescribed a five step evaluative process to be employed in determining whether an individual is disabled.  *See* 20 C.F.R. §§ 404.1520, 416.920.  The first step requires a determination of whether the claimant is engaging in substantial gainful activity; if so, then the claimant is not disabled, and the inquiry need proceed no further.  *Id.* §§ 404.1520(b), 416.920(b).  If the claimant is not gainfully employed, then the second step involves an examination of whether the claimant has a severe impairment or combination of impairments which significantly restricts his or her physical or mental ability to perform basic work activities.  *Id.* §§ 404.1520(c), 416.920(c). If the claimant is found to suffer from such an impairment, the agency must next determine whether it meets or equals an impairment listed in Appendix 1 of the regulations.  *Id.* §§ 404.1520(d), 416.920(d); *see also id.* Part 404,

Subpt. P, App. 1.  If so, then the claimant is "presumptively disabled".

*Martone*, 70 F. Supp.2d at 149 (citing *Ferraris v. Heckler*, 728 F.2d 582, 584

(2d Cir. 1984)); 20 C.F.R. §§ 404.1520(d), 416.920(d).

If the claimant is not presumptively disabled, step four requires an

assessment of whether the claimant's RFC precludes the performance of his

or her past relevant work.  20 C.F.R. §§ 404.1520(e), 416.920(e).  If it is

determined that it does, then as a final matter the agency must examine

whether the claimant can do any other work.  *Id.* §§ 404.1520(f), 416.920(f).

The burden of showing that the claimant cannot perform past work lies

with the claimant.  *Perez v. Chater*, 77 F.3d 41, 46 (2d Cir. 1996); *Ferraris*,

728 F.2d at 584.  Once that burden has been met, however, it becomes

incumbent upon the agency to prove that the claimant is capable of

performing other work.  *Perez*, 77 F.3d at 46.  In deciding whether that burden

has been met, the ALJ should consider the claimant's RFC, age, education,

past work experience, and transferability of skills.  *Ferraris*, 728 F.2d at 585;

*Martone*, 70 F. Supp.2d at 150.

C.    The Evidence In This Case

In support of her challenge to the agency's determination plaintiff raises

three arguments, contending that 1) in finding no disability, the ALJ improperly

19

discounted her subjective complaints; 2) the finding that she retains the RFC to perform light work is not supported by substantial evidence; and 3) the ALJ improperly relied on the grid, rather than eliciting testimony from a vocational expert, to satisfy the Commissioner's burden at step five of the relevant test and determine plaintiff's ability to perform available work.

### 1.   Subjective Complaints

The primary emphasis of plaintiff's argument regarding the ALJ's credibility assessment is that the ALJ improperly discounted her subjective complaints concerning the limitations caused by her CFS, depression, and anxiety.  Dkt. No. 9 at pp. 15-20.  The ALJ's decision also discounts plaintiff's testimony that she is further limited by pain in her back, hip, groin, and pelvic area.  AT 39, 43.

CFS is a medically determinable impairment that can form the basis for a finding of "disability" when accompanied by appropriate medical signs or laboratory findings.[13]  Social Security Ruling ("SSR") 99-2p, 1999 WL 271569,

---

[13]     CFS is defined by one source as

> [l]ong-standing, severe, disabling fatigue without demonstrable muscle weakness.  Underlying disorders that could explain the fatigue are absent.  Depression, anxiety, and other psychologic diagnoses are typically absent.  Treatment is rest and psychologic support, often including antidepressants.

at *1 (S.S.A.).  In a ruling which addresses the condition, the agency has

established guidelines for analyzing claims of disability on the basis of CFS,

and provided the following definition:

> CFS is a systemic disorder consisting of a complex
> of symptoms that may vary in incidence, duration,
> and severity.  It is characterized in part by prolonged
> fatigue that lasts 6 months or more and that results
> in substantial reduction in previous levels of
> occupational, education, social, or personal
> activities. . . .  Under the [Centers for Disease
> Control and Prevention ("CDC")] definition, the
> hallmark of CFS is the presence of clinically
> evaluated, persistent or relapsing chronic fatigue
> that is of new or definite onset (i.e., has not been
> lifelong), cannot be explained by another physical or
> mental disorder, is not the result of ongoing exertion,
> is not substantially alleviated by rest, and results in
> substantial reduction in previous levels of
> occupational, educational, social, or personal
> activities.

SSR 99-2p, 1999 WL 271569, at *1.  A claimant meets the CDC's current

definition of CFS if, after other diagnostic possibilities have been ruled out, he

or she reports persistent or relapsing chronic fatigue and exhibits at least four

of the following symptoms concurrently for at least six consecutive months: (1)

impaired memory or concentration; (2) sore throat; (3) tender cervical or

axillary lymph nodes; (4) muscle pain; (5) multi-joint pain; (6) headaches; (7)

---

*The Merck Manual of Diagnosis and Therapy* 2740 (18th ed. 2006).

unrefreshing sleep; and (8) post-exertional malaise. *Id.* at *1-*2. An individual with CFS can also exhibit a wide variety of other manifestations, including fainting, dizziness, and mental problems (e.g., depression, irritability, and anxiety). *Id.* at *2.

Since the methods for diagnosing CFS are limited, the credibility of a claimant's testimony regarding his or her symptoms takes on "substantially increased" significance in the ALJ's evaluation of the evidence. *Fragale v. Chater*, 916 F.Supp. 249, 254 (W.D.N.Y. 1996) (citing *Reed v. Sec. of Health & Human Servs.*, 804 F.Supp. 914, 918 (E.D. Mich. 1992)). An ALJ, however, is not required to blindly accept the subjective testimony of a claimant. *Marcus v. Califano*, 615 F.2d 23, 27 (2d Cir. 1979); *Martone*, 70 F. Supp.2d at 151 (citing *Marcus*, 615 F.2d at 27). Rather, an ALJ retains the discretion to evaluate a claimant's subjective testimony, including testimony concerning pain. *See Mimms v. Heckler,* 750 F.2d 180, 185-86 (2d Cir. 1984) (citations omitted). In deciding how to exercise that discretion, an ALJ must consider a variety of factors which ordinarily would inform the credibility analysis in any context, including the claimant's credibility, his or her motivation, and the medical evidence in the record. *See Sweatman v. Callahan*, No. 96-CV-1966, 1998 WL 59461, at *5 (N.D.N.Y. Feb. 11, 1998) (Pooler, D.J. and Smith, M.J.)

(citing *Marcus*, 615 F.2d at 27-28)).   Weighing the available evidence, the ALJ

must reach an independent judgment concerning the actual extent of pain

suffered and its impact upon the claimant's ability to work.   *Id.*

When a claimant's subjective testimony is consistent with and

supported by objective clinical evidence demonstrating that he or she has

a medical impairment which one could reasonably anticipate would

produce such pain, it is entitled to considerable weight.[14]   *Barnett*, 13 F.

Supp.2d at 316; *see also* 20 C.F.R. §§ 404.1529(a), 416.929(a).   If the

claimant's testimony concerning the intensity, persistence or functional

limitations associated with his or her pain is not fully supported by clinical

evidence, however, then the ALJ must consider additional factors in order

to assess that testimony, including: 1) daily activities; 2) location, duration,

frequency and intensity of any symptoms; 3) precipitating and aggravating

factors; 4) type, dosage, effectiveness and side effects of any medications

taken; 5) other treatment received; and 6) other measures taken to relieve

symptoms.   20 C.F.R. §§ 404.1529(c)(3)(i)-(vi), 416.929(c)(3)(i)-(vi).

After considering plaintiff's subjective testimony, the objective

─────────────────

[14]      In the Act, Congress has specified that a claimant will not be regarded as
disabled unless he or she supplies medical or other evidence establishing the
existence of a medical impairment which would reasonably be expected to produce the
pain or other symptoms alleged. 42 U.S.C. § 423(d)(5)(A).

medical evidence, and any other factors deemed relevant, the ALJ may accept or reject claimant's subjective testimony.  *Martone*, 70 F. Supp.2d at 151; *see also* 20 C.F.R. §§ 404.1529(c)(4), 416.929(c)(4).  If such testimony is rejected, however, the ALJ must explicitly state the basis for doing so with sufficient particularity to enable a reviewing court to determine whether those reasons for disbelief were legitimate, and whether the determination is supported by substantial evidence.  *Martone*, 70 F. Supp.2d at 151 (citing *Brandon v. Bowen,* 666 F. Supp. 604, 608 (S.D.N.Y. 1987)).  Where the ALJ's findings are supported by substantial evidence, the decision to discount subjective testimony may not be disturbed on court review.  *Aponte v. Sec., Dep't of Health & Human Servs. of U.S.,* 728 F.2d 588, 591 (2d Cir. 1984).

In arriving at his finding of no disability, ALJ Stephan discounted plaintiff's subjective complaints on the basis that there was "very little medical support" for these claims.  AT 23.  This summary rejection of plaintiff's pain complaints does little justice to the expansive medical record before the agency.  The record shows that plaintiff has been diagnosed as suffering from CFS, major depression, dysthymic disorder, panic attacks, generalized anxiety disorder, lower back and right hip pain,

osteitis pubis, spinal instability, headaches, and migraines.  *See* AT 214-215, 220, 277, 284, 295, 303-307, 309, 312, 315, 317, 330.  The record also documents plaintiff's repeated complaints of fatigue,[15] depression and anxiety,[16] pain,[17] headaches and migraines,[18] dizziness and feeling lightheaded,[19] and poor concentration and memory,[20] all of which are consistent with a diagnosis of CFS.[21]  *See* SSR 99-2p, 1999 WL 271569, at *1-*2.

"[W]hen presented with documented allegations of symptoms which are 'entirely consistent with the symptomatology' for evaluating CFS, the Secretary cannot rely on the ALJ's rejection of the claimant's testimony based on the mere absence of objective evidence."  *Fragale*, 916 F.Supp. at 254 (quoting *Williams v. Shalala,* 94-CV-426S, 1995 WL 328487, at *6

---

[15]    *See*, *e.g.*, AT 205, 209, 210, 214, 256, 257, 284, 286, 300, 304-305, 312, 314-316, 326.

[16]    *See*, *e.g.*, AT 208-211, 214, 218, 255, 257, 286, 292, 303, 312, 314-316.

[17]    *See*, *e.g.*, AT 255, 256, 259, 277, 284, 288, 326-327.

[18]    *See*, *e.g.*, AT 210, 211, 218, 257, 284, 286, 303, 306, 309, 316, 327.

[19]    See, *e.g.*, AT 210, 292.

[20]    *See*, *e.g.*, AT 218, 303, 312.

[21]    The record shows that plaintiff's complaints of fatigue and depression extend as far back as 1997, and that she began reporting anxiety as early as in 1999. *See*, *e.g.*, AT 147, 171.

(W.D.N.Y. May 19, 1995)).  "Instead, the Secretary's decision in such cases should reflect a recognition of the increased significance to be given the claimant's credibility in assessing [RFC]."  *Id.* (citing *Reed*, 804 F.Supp. at 918); *see also Schulte v. Apfel*, No. 98-CV-422E(F), 2000 WL 362025, at *15 (W.D.N.Y. Mar. 31, 2000) (noting that all of plaintiff's symptoms were entirely consistent with the symptomatology recognized by the Commissioner) (citing Secretary's Program Operations Manual System ("POMS") (1993) § DI 24575.005); *see also Lunan v. Apfel*, No. 98-CV-1942, 2000 WL 287988, at *6 (N.D.N.Y. Mar. 10, 2000) (Mordue, D.J. and Smith, M.J.) (finding that the ALJ's rejection of the plaintiff's credibility was not supported by substantial evidence because the plaintiff's repeated complaints were "entirely consistent" with the symptomatology of CFS) (citing *Fragale*, 916 F.Supp. at 254).[22]  Thus,

---

[22]    For much the same reason, courts have generally found that the unavailability of clinical test results alone is not a sufficient basis upon which a physician's diagnosis of fibromyalgia may be rejected as unsupported by objective clinical findings.  *See Green-Younger v. Barnhart*, 335 F.3d 99, 108 (2d Cir. 2003); *Cruz v. Apfel*, 97-CV-1170, 1998 U.S. Dist. LEXIS 23385, at *22-*23 (N.D.N.Y. Nov. 4, 1998) (DiBianco, M.J.) (citing *Lisa*, 940 F.2d at 44), *adopted*, 1998 U.S. Dist. LEXIS 23384 (N.D.N.Y. Dec. 21, 1998).  As the Second Circuit has explained,

> [i]n stark contrast to the unremitting pain of which fibrositis patients complain, physical examinations will usually yield normal results – a full range of motion, no joint swelling, as well as normal muscle strength and neurological reactions.

even were the record in this case properly construed as lacking in

objective evidence, to support plaintiff's claims, in this instance, the ALJ

nonetheless should not have summarily discounted plaintiff's testimony, in

light of the documented allegations of symptoms which are entirely

consistent with the protocol for evaluating CFS.

In his decision, the ALJ also discounted plaintiff's subjective

complaints in light of her reports that "although she suffers from fatigue,

she is able to cook, perform light housekeeping, drive, and tend to her

garden with rest breaks.  She is able to bathe and dress independently

and do light activities."  AT 23.  The ALJ's description of plaintiff's

activities, however, does not accurately reflect her testimony.  At the

hearing, plaintiff testified that her daily activities include "try[ing]" to clean

her house, tend to her garden, and cook, although cooking is a "struggle"

and she goes out to dinner one to two times per week with her husband

when she is too tired to cook.  AT 39-43.  Plaintiff further stated that she is

---

> There are no objective tests which can conclusively confirm
> the disease; rather, it is a process of diagnosis by exclusion
> and testing of certain "focal tender points" on the body for
> acute tenderness which is characteristic in fibrositis patients.

*Lisa*, 940 F.2d at 45 (quoting *Preston v. Sec'y of Health & Human Servs.*, 854 F.2d 815,
817-18 (6th Cir. 1988)).

unable to wash dishes on a daily basis, does not vacuum or sweep on a regular basis, and does laundry every two weeks.  AT 40-41.  Plaintiff stated that she naps every twenty to thirty minutes, "when the fatigue is really bad" and at times she also must lie down "just to clear [her] head." AT 35.  The length of her naps "depends on [her] body at the time."  *Id.* She also stated that drives a car "about . . . two to three times a week . . . . depending on if [she] really [has] to or not."  AT 30.  Plaintiff also stated that she is able to dress herself "okay" but due to a problem with her right hip she must sit down to put on her pants.  AT 41.  Plaintiff further claimed that she no longer exercises or does anything for recreation, cannot fish or hunt, and no longer participates in craft shows.  AT 41-42, 47.

After a review of the testimony, I find that even as characterized by the ALJ, plaintiff's stated activities do not preclude a finding of disability. *See Bischof v. Apfel*, 65 F.Supp.2d 140, 147 (E.D.N.Y. 1999) (finding that even as characterized by the ALJ, the plaintiff's lifestyle does not preclude a finding of disability).  As the Second Circuit has stated:

> when a person gamely chooses to endure [her ailment] in order to pursue important goals, such as attending church and helping [her spouse] on occasion to go shopping for the family, it would be a shame to hold this endurance against her in determining benefits unless [her] conduct truly

showed that [s]he is capable of working.

*Id.* (quoting *Balsamo v. Chater*, 142 F.3d 75, 81 (2d Cir. 1998) (citations and internal quotations omitted)).  Plainly, "a claimant need not be an invalid to be disabled under the Social Security Act."  *Id.* (citing *Balsamo*, 142 F.3d at 81 (citations omitted)).  In sum, I find that the ALJ misstated plaintiff's testimony and that her limited activities do not preclude a finding of disability.

The ALJ also rejected plaintiff's subjective complaints of musculoskeletal pain based on a lack of diagnostic and clinical findings, usage of "only" over-the-counter medication, and "sporadic treatment."  AT 23.  Once again, however, the medical evidence and plaintiff's testimony demonstrate otherwise.  On July 18, 2002, plaintiff saw Dr. Neil Colman, complaining of back pain.  AT 277.  Dr. Colman noted that since 1991, plaintiff has experienced "intermittent episodes of back pain" and determined that plaintiff's history "is most consistent with spinal instability and I have described to her the nature of two bones slipping one over the other, and producing muscle spasms."  *Id.*  Dr. Colman recommended that plaintiff undergo physical therapy and noted that she will be referred to

"Wellness Solutions" for range of motion and strengthening of her back.[23]

AT 277.

On October 10, 2002, Dr. Betsy Fuchs conducted an initial physical evaluation of plaintiff and noted that "tender point testing for fibromyalgia was done and she had about 4 points positive."[24]  AT 287.  In addition, Dr.

_____

[23]    On July 16, 2002, only two days prior to her appointment with Dr. Colman, plaintiff was diagnosed as suffering from low back pain by Janet Whalen, R.N. F.N.P.-C.  AT 255-256.  Under the regulations, reports of a nurse practitioner may be offered to show the severity of a claimant's impairment and how it affects the ability to work. *See* 20 C.F.R. § 404.1513(d)(1).  Nurse Whalen noted that plaintiff was "in obvious physical pain . . . [and] unable to bend at all, walks stiffly [and has negative] leg raise."  AT 255-256.  She also noted that plaintiff was using a cane "to mobilize."  AT 256.

[24]    Fibromyalgia is described by a leading medical source as follows:

> A syndrome of chronic pain of musculoskeletal origin but uncertain cause.  The American College of Rheumatology has established diagnostic criteria that include pain on both sides of the body, both above and below the waist, as well as in an axial distribution (cervical, thoracic, or lumbar spine or anterior chest); additionally there must be point tenderness in at least 11 of 18 specified sites.

Stedmans Medical Dictionary (27th ed. 2000).  Fibromyalgia is also commonly referred to as fibrositis.  *Green-Younger*, 335 F.3d at 101 n.1.  Generally, fibromyalgia has been recognized as a potentially severe impairment that may support a claim of disability under the Act.  *Id.* at 108; *Lisa*, 940 F.2d at 44-45.  Addressing the condition, the Seventh Circuit has explained:

> [F]ibromyalgia . . . [is] a common, but elusive and mysterious disease, much like chronic fatigue syndrome, with which it shares a number of features.  Its cause or causes are unknown, there is no cure, and of greatest importance to disability law, its symptoms are entirely subjective.  There are no laboratory tests for the presence or severity of fibromyalgia.  The principal symptoms are "pain all over," fatigue, disturbed sleep, stiffness, and – the only symptom that discriminates between it and other diseases of a rheumatic character – multiple tender spots, more precisely

Fuch's notes show that due to plaintiff's subsequent complaints of "discomfort" in her right groin, AT 288, she ordered an x-ray of plaintiff's right hip which showed evidence of "moderate" osteitis pubis, a symptom-producing inflammatory condition of the pubic bones.[25]  AT 284.  These observations are confirmed by Dr. Pocha who, on examining the plaintiff on September 4, 2003, noted that she had difficulty performing a full squat;[26] had "tender points right to the spine on her upper lumber spine;" and "declined backward extension, abduction, or adduction as she is concerned with having more pain."  AT 328, 329.  Dr. Pocha diagnosed plaintiff as suffering from lower back and right hip pain.  AT 330.

_____

> 18 fixed locations on the body (and the rule of thumb is that the patient must have at least 11 of them to be diagnosed as having fibromyalgia) that when pressed firmly cause the patient to flinch.  All these symptoms are easy to fake, although few applicants for disability benefits may yet be aware of the specific locations that if palpated will cause the patient who really has fibromyalgia to flinch. . . . Some people may have such a severe case of fibromyalgia as to be totally disabled from working, but most do not[.]

*Sarchet v. Chater*, 78 F.3d 305, 306-07 (7th Cir. 1996) (internal citations omitted).

[25]     Osteitis pubis is defined as a symptom-producing inflammatory condition of the pubic bones in the region of the symphysis, which may be associated with surgical procedures on pelvic structures or with pregnancy, infection of the urinary tract, degenerative changes, rheumatic disease, or other conditions.  *Dorland's Illustrated Medical Dictionary* 1332 (30th ed. 2003).

[26]     This is consistent with hearing testimony given by the plaintiff, who described experiencing a "very sharp pain" in her pelvic area when she stood up in her garden after squatting.  AT 44.

In short, the ALJ's assertion as to the lack of diagnostic and clinical findings regarding plaintiff's musculoskeletal pain is contrary to, and thus not supported by, medical evidence in the record.

The ALJ's rejection of plaintiff's pain complaints also resulted from his findings that plaintiff "only takes over-the-counter medication for her musculoskeletal impairment," AT 23, and additionally sought and received treatment on only a sporadic basis.  These findings, once again, are flatly contradicted by evidence in the record and subject to plausible explanations which could substantially discount their significance.  As the ALJ himself recognized, plaintiff does take "an occasional muscle relaxer for pain."  AT 19.  Moreover, plaintiff testified to using Flexeril to assist with her back pain.  AT 37.   Flexeril is indicated as an adjunct to rest and physical therapy for relief of muscle spasm associated with acute, painful musculoskeletal conditions.  *Physicians' Desk Reference* 1930, 1931 (59th ed. 2005).[27]

Before relying on the infrequency of treatment for a condition, as did ALJ Stephan in this instance, an ALJ is duty bound to inquire into possible

---

[27]     Flexeril is cyclobenzaprine hydrochloride.  *Physicians' Desk Reference* 1930, 1931 (59th ed. 2005).  Plaintiff's pharmacy records indicate that cyclobenzaprine was dispensed on July 12, 2002.  AT 289.

explanations for lack of treatment.[28]  SSR 96-7p, 1996 WL 374186, at *7.

Such explanations may include that "[t]he individual may be unable to

afford treatment and may not have access to free or low-cost medical

services."  *Id.* at *8.  In this instance the ALJ did not inquire into possible

reasons for plaintiff's "sporadic" treatment for her musculoskeletal pain nor

did he discuss any possible reasons in his decision.[29]

---

[28]     Social Security Ruling 96-7p provides, in relevant part, that

> the adjudicator must not draw any inference about an
> individual's symptoms and their functional effects from a
> failure to seek or pursue regular medical treatment without
> first considering any explanations that the individual may
> provide, or other information in the case record, that may
> explain infrequent or irregular medical visits or failure to seek
> medical treatment.  The adjudicator may need to recontact
> the individual or question the individual at the administrative
> proceeding in order to determine whether there are good
> reasons the individual does not seek medical treatment or
> does not pursue treatment in a consistent manner.

SSR 96-7p, 1996 WL 374186, at *7.

[29]     The record in this case reveals several plausible explanations for plaintiff
seeking only sporadic treatment of her musculoskeletal symptomology.  Several
excerpts from the record suggest uncertain financial circumstances on the part of the
plaintiff.  *See, e.g.,* AT 205, 206 and 258 (progress notes from Whitney M. Young, Jr.,
stating that plaintiff does not have insurance); AT 292 (progress notes from Samaritan
Hospital, noting that she had "recently filed for bankruptcy") AT 310 (note from Dr.
John Morris to the effect that plaintiff has marked increase in the demands financially
for the multiple medications with which she is being treated); *see also* AT 21 (ALJ
decision noting that plaintiff "had recently fil[ed] for bankruptcy."  These types of
circumstances should be considered by an ALJ as potentially offering a reasonable
explanation for obtaining only sporadic treatment for pain complaints.  *See Iuteri v.
Barnhart*, No. Civ. 3:03CV393, 2004 WL 1660580, at *12 (D. Conn. Mar. 26, 2004)
(noting that plaintiff's poor financial situation may offer reasonable explanation for lack
of ongoing mental health treatment).

The ALJ's conclusion regarding sporadic treatment of plaintiff's musculoskeletal condition is also contrary to suggestions in the record, to the effect that plaintiff indeed has sought treatment.  At the hearing, plaintiff testified that she "just recently started going to the chiropractor in the last two months because I couldn't take the hip pain anymore . . . and he noticed that I have a deteriorating disk - - and that's just been in the last couple months."  AT 43.  This was also noted in Dr. Pocha's report as follows:

> She has a bulging disk in her lumbar spine, diagnosed in 07/03 with x-ray.  She said she has sharp pain on and off from this disk pinching on her nerves.  The pain is located in her right lower back and right hip area.  She sees a chiropractor frequently.  She said without seeing him and getting pain relief by him, it would be much worse.

AT 327.

It therefore appears that plaintiff was in fact being treated for her

---

The record also reflects that plaintiff's sporadic treatment may also be explained based upon her reluctance to drive.  *See, e.g.,* AT 38 (indicating that plaintiff reduced the frequency of her visits to her psychiatrist because of driving, after almost experiencing a major accident); *see also* AT 32 (plaintiff testifying that she stopped driving the school bus because of her fatigue and anxiety); AT 331 (Dr. Pocha noting that "[r]egarding [plaintiff's] sleep apnea syndrome, she should not operate machines or drive a car").

musculoskeletal condition.[30]  While the record does not contain any

documentation from a chiropractor, the Second Circuit has instructed that

"where there are deficiencies in the record, an ALJ is under an affirmative

obligation to develop a claimant's medical history."  *Rosa v. Callahan*, 168

F.3d 72, 79 (2d Cir. 1999); *Foster v. Callahan*, No. 96-1858, 1998 WL

106231, at *5 (N.D.N.Y. Mar. 3, 1998) (Pooler, D.J.) ("An ALJ is obligated to

help the parties develop a full and fair record, even if the claimant is

represented by counsel . . . [and] should make every reasonable effort to

obtain treating source evidence . . .") (internal citations omitted); *see also* 42

U.S.C. § 423(d)(5)(B); 20 C.F.R. § 404.1512(d), (e); SSR 96-8p, 1996 WL

374184, at *5 (S.S.A.).  An ALJ is authorized to issue subpoenas demanding

the production of any evidence relating to a deficiency in the record.  *Baize v.

Barnhart*, No. CV-02-3654, 2003 WL 23303419, at *9 (E.D.N.Y. Nov. 24,

2003) (citing 42 U.S.C. § 405(d)); *Treatwell v. Schweiker*, 698 F.2d 137, 141

(2d Cir. 1983)).  Where there are gaps in the administrative record, remand to

the Commissioner for further development of the evidence is appropriate.  *Id.*

---

[30]     It is well established that an ALJ is not required to give particular weight to a
chiropractor's findings, as a chiropractor is not an "acceptable medical source" under
the Commissioner's regulations.  *See Diaz v. Shalala*, 59 F.3d 307, 313 (2d Cir. 1995)
(citing 20 C.F.R. § 404.11513(a)).  Nonetheless, reports from chiropractors may assist
an ALJ in determining whether a claimant is disabled, and "thus should not be
discounted arbitrarily."  *Id.* at 312 n.4.

(citing *Rosa*, 168 F.3d at 83; *Sobolewski v. Apfel*, 985 F.Supp. 300, 314 (E.D.N.Y. 1997)).

In this instance, the record is deficient with respect to the chiropractor whom plaintiff testified she was seeing, and is mentioned in Dr. Pocha's report. In light of this deficiency, the ALJ was under an affirmative obligation to develop plaintiff's medical history. The ALJ's failure to fulfill this obligation by neglecting to obtain or attempt to obtain the records of the chiropractor or even ascertain the chiropractor's identity, constituted legal error further undermining his rejection of plaintiff's pain complaints. *See Rosa*, 168 F.3d at 80 (finding that ALJ erred in failing to acquire or attempt to obtain records of physicians that plaintiff identified both during her testimony and in meetings with other physicians, as well as records from a physical therapist that were identified in a physician's notes); *Baize*, 2003 WL 23303419, at *9 (finding that compliance with the obligation to develop a claimant's medical history "should have motivated" the ALJ to request treatment notes from chiropractor).

The ALJ also discounted plaintiff's subjective complaints on the basis that "the frequency and severity of her symptoms and limitations are not fully credible." AT 23. SSR 99-2P specifically notes, however, that "[t]he medical

36

signs and symptoms of CFS fluctuate in frequency and severity." SSR 99-2P, 1999 WL 271569, at *5. Accordingly, it is reasonable to assume that plaintiff would have good days and bad days, and that her abilities would fluctuate accordingly. *See Persico v. Barnhart*, 420 F.Supp.2d 62, 74 (E.D.N.Y. 2006) (finding that "fact that plaintiff was, at some points during her alleged period of disability, able to shop, do dishes, perform self-care activities, and watch television should not foreclose a finding of disability due to CFS").

The ALJ further discounted plaintiff's subjective complaints on the basis that plaintiff's depression and anxiety improved with regular medication treatment. AT 23. As previously noted, SSR 96-7p provides that an ALJ must not draw any inferences about an individual's symptoms and their functional effects from a failure to obtain particular treatment without first considering any explanations that the individual may provide, or other pertinent information from the case record. SSR 96-7p, 1996 WL 374186, at *7. Those explanations may include that "[t]he individual may not take prescription medication because the side effects are less tolerable than the symptoms [and that] [t]he individual may be unable to afford treatment and may not have access to free or low-cost medical services." *Id.* at *8.

For support of his conclusion that plaintiff's mental condition improved

with regular medication treatment, the ALJ cited Dr. Adrian Morris of

Samaritan Hospital, who commented that plaintiff has a history of stopping

medication.  AT 23.  Upon plaintiff's discharge from Samaritan Hospital, on

October 1, 2002, Dr. Morris noted the following:

> [Plaintiff] complained about concerns about what the
> medication would do to her brain. [She] has a history
> of stopping medications.  She was educated and re-
> educated several times about the risks, benefits and
> side effects of medications, the role of medications
> and verbalized understanding.  She was educated
> about her mental illness and verbalized
> understanding.  The patient continues to have
> ruminating thoughts and was then started on Luvox
> at night, 100 mg.  She has tolerated this well.
> Patient started to show increase in mood and
> increase in energy.  Her suicidal ideation diminished
> and resolved.  She was less tearful . . . [Her] family
> were able to verbalize to the patient the progress
> she has made and could see her improved . . . .
> There remains a concern because [she] continues to
> ruminate about the medications with limited insight
> into the role and so, will probably be at risk for
> stopping them again and noncompliance.

AT 313.  As was the case regarding the intermittency of her treatment,

however, the ALJ did not inquire into possible reasons for plaintiff's history of

stopping medication nor did he discuss any possible reasons in his decision.[31]

_____

[31]   It is well-documented that plaintiff suffers from anxiety, a condition which
could reasonably cause her to fear medications, and thus not follow a prescribed
course of treatment.  *See Iuteri*, 2004 WL 1660580, at *12 (finding that it is well
documented that plaintiff suffers from anxiety and panic disorder which could

Additionally, the medical records indicate that plaintiff has a documented history of experiencing side effects from the medications she has taken for her mental condition.  On June 22, 1999, Dr. Sean Roche of the Albany Medical Center, noted complaints by the plaintiff that Paxil caused fatigue; Zoloft caused diarrhea, decreased sleep and increased "jumpiness;" and Wellbutrin caused poor concentration and "fuzzy feeling."  AT 147.  In a progress note from November 19, 1999, Dr. Roche noted that plaintiff has tried "Wellbutrin and Paxil in the past without improvement and with some side effects."  AT 143.  A note from Whitney M. Young, Jr. Health Center dated May 4, 2000 states that plaintiff claims she "has been on Zoloft, Buspar, unable to take due to side effects."  AT 210.

In October 2002, following her hospitalization, plaintiff began receiving treatment at the outpatient clinic of Samaritan Hospital.  AT 292.  A note dated October 21, 2002, from that facility states that plaintiff "was on Zoloft in past, Wellbutrin, Buspar[;] sensitive to high doses" and that plaintiff "probably needs low dose [of Effexor] due to CFS and propensity for side effects."  AT 303.  Plaintiff was then prescribed Effexor.  *Id.*  On January 6, 2003, it was

---

reasonably cause her to fear side effects, and thus not follow a prescribed course of treatment).  Contrary to the ALJ's conclusion, this may not be indicative of lack of credibility; instead it may reasonably be considered evidence in support of her claim of severe limitation due to her mental condition.  *See id.*

noted that plaintiff had an increase in fatigue, poor sleep, and some occasional muscle twitches.  AT 305.  Later on February 3, 2003, it was noted that plaintiff tolerates Effexor "ok" and she has had "some response, limited, still has problems with sleep/fatigue - complicated by CFS, sleep apnea [and] other chronic [symptoms]."  AT 306.  On April 3, 2003, it was noted that plaintiff was tapering off Effexor, and had some decreased side effects, including "shock like feelings in her limbs, especially before [her] periods."  AT 307.  Plaintiff apparently resumed taking Effexor, however, due to increased worrying, and it was noted on June 30, 2003 that plaintiff was experiencing "restless legs."  AT 309.

While the record documents plaintiff's complaints of side effects from the various medications she has taken for her mental condition in the past, I note that it is unclear whether the medication that plaintiff testified to taking, Effexor, causes her to experience fatigue.  Plaintiff testified, "I just started recently taking the Effexor again.  I have terrible side effects from - - a lot of medication that causes any kind of fatigue.  It's just really hard for me to, you know, stay on it."  AT 37.  The ALJ then asked plaintiff if the Effexor helped her.  *Id.*  Plaintiff responded, "[i]t doesn't help the fatigue.  It helps with the compulsive worrying, but it doesn't help with the fatigue."  AT 38.  Plaintiff's

testimony is somewhat unclear on this score, since her initial statement

regarding side effects is abrupt, and she then appears to assert that

medications in general cause her fatigue.  *See* AT 37.  Plaintiff also states

that Effexor "doesn't help with the fatigue", though she does not assert that it

causes fatigue.

Importantly, an ALJ "must not draw any inferences about an individual's

symptoms and their functional effects without first considering any

explanations that the individual may provide, or other information from the

case record," *see* SSR 96-7p, 1996 WL 374186, at *7, such as that the side

effects are less tolerable than the symptoms.  *Id.* at *8.  In this instance, the

ALJ did not discuss whether he considered plaintiff's history of side effects as

a reason for stopping her medications.  Moreover, the ALJ did not consider

whether plaintiff's uncertain financial situation may have caused plaintiff to

stop taking medications at various times.

Lastly, I note that while treatment records from Whitney M. Young, Jr.

Health Center from July and October 2000 indicate that plaintiff refused

counseling and medications, and it was reported that plaintiff "feels she can

do it herself," these statements do not necessarily undermine plaintiff's

credibility.  *See Iuteri*, 2004 WL 1660580, at *12 (finding that while plaintiff's

41

decision to forgo surgery for carpal tunnel syndrome, or her professed desire to control her diabetes "on her own" may not reflect wise health decisions, the statements do not necessarily undermine her credibility); *see also Zorilla v. Chater*, 915 F.Supp. 662, 669 (S.D.N.Y. 1996) (citing *De Leon v. Sec. of Health & Human Servs.*, 734 F.2d 930, 934 (2d Cir. 1984) ("A claimant's denial of psychiatric disability or the refusal to obtain treatment for it is not necessarily probative.")).  Additionally, plaintiff's financial situation may well provide an explanation for such refusal, since the same progress note from October 2000 states that plaintiff does not have insurance.  *See* AT 206; SSR 96-7p, 1996 WL 374186, at *8 ("[t]he individual may be unable to afford treatment and may not have access to free or low-cost medical services").

In light of the foregoing, I find that the ALJ's discounting of plaintiff's subjective complaints is not supported by substantial evidence.  Moreover, I find that the ALJ shirked his affirmative duty to develop plaintiff's medical history to cure the void resulting from the lack of information from plaintiff's chiropractor.  Accordingly, it is recommended that the ALJ's decision be reversed, and the matter remanded for further evaluation.

## 2. The ALJ's RFC Finding

The lynchpin of the ALJ's finding of no disability is his conclusion that

42

notwithstanding her physical and mental limitations, plaintiff retains the RFC
to perform simple, low stress work at the light work exertional level, provided
that the position in which she works does not require "constant contact with
others[.]" AT 24. Plaintiff challenges this RFC finding as lacking the support
of substantial evidence in the record.

A claimant's RFC represents a finding of the range of tasks he or she is
capable of performing notwithstanding the impairments at issue. 20 C.F.R. §
404.1545(a). An RFC determination is informed by consideration of a
claimant's physical abilities, mental abilities, symptomatology, including pain,
and other limitations which could interfere with work activities on a regular and
continuing basis. *Id.*; *Martone*, 70 F.Supp.2d at 150.

To properly ascertain a claimant's RFC, an ALJ must therefore assess
plaintiff's exertional capabilities, addressing his or her ability to sit, stand,
walk, lift, carry, push and pull. 20 C.F.R. § 404.1569a. Nonexertional
limitations or impairments, including impairments which result in postural and
manipulative limitations, must also be considered. 20 C.F.R. § 404.1569a;
*see also* 20 C.F.R. Part 404, Subpt. P, App. 2 § 200.00(e). When making an
RFC determination, an ALJ must specify those functions which the claimant is
capable of performing; conclusory statements concerning his or her

capabilities, however, will not suffice.  *Martone*, 70 F.Supp.2d at 150 (citing

*Ferraris*, 728 F.2d at 587).  Further, "[t]he RFC assessment must include a

narrative discussion describing how the evidence supports each conclusion,

citing specific medical facts (e.g., laboratory findings) and nonmedical

evidence (e.g. daily activities, observations)."  SSR 96-8p, 1996 WL 374184,

at *7 (S.S.A.).  An administrative RFC finding can withstand judicial scrutiny

only if there is substantial evidence in the record to support each requirement

listed in the regulations.  *Martone*, 70 F.Supp.2d at 150 (citing *LaPorta v.

Bowen*, 737 F. Supp. 180, 183 (N.D.N.Y. 1990)); *Sobolewski*, 985 F.Supp. at

309-10.

### a.    Evaluation of Plaintiff's Physical Condition

With regard to the alleged exertional limitations imposed by plaintiff's

physical condition, the ALJ determined that while plaintiff "should avoid

frequent bending and significant lifting . . . the objective evidence supports the

ability to sit, stand and walk for six hours in an eight-hour workday with normal

breaks and lift 20 pounds."  AT 23.

The record before the agency, containing many records associated with

the care and treatment of plaintiff's conditions, is lacking in RFC assessments

from treating sources.  Specific findings before the ALJ regarding plaintiff's

exertional capabilities were limited to Dr. Christine Pocha's consultative opinion, as well as the RFC assessment that was completed by an unknown individual. *See* AT 241-248, 326-335.

Unquestionably, the views of Dr. Pocha, as a licensed medical doctor, are properly regarded as medical opinions, even though she merely evaluated the plaintiff in a consultative role, but did not treat her. *Hilton v. Comm'r of Soc. Sec.*, No. 3:01 CV 1164, 2002 WL 32152290, at *13 (D. Conn. Nov. 25, 2002) (citing *Diaz*, 59 F.3d at 312, 313; 20 C.F.R. §§ 404.1513(a)(1), (e), 404.1527(a)(2)). In evaluating a claimant's disability, however, an ALJ should give only limited weight to a consulting physician's opinions or report, since consultative examinations are often brief, are generally performed without benefit or review of claimant's medical history and, "at best, only give a glimpse of the claimant on a single day." *Id.* (quoting *Simmons v. U.S. R.R. Ret. Bd.*, 982 F.2d 49, 55 (2d Cir. 1995) (citations omitted)).

In this case, it appears that the ALJ in fact did not adopt any of Dr. Pocha's findings as to plaintiff's exertional limitations, instead crafting his own findings regarding her exertional capabilities. AT 23. In one respect the ALJ's findings are more restrictive than those attributed by Dr. Pocha, finding a six hour limitation upon plaintiff's ability to sit, stand and walk in an eight

hour workday whereas Dr. Pocha placed no restrictions on her ability to
perform these activities and clearly noted that these findings were conditioned
on plaintiff being able to perform these activities "at her own pace." *Compare*
AT 23 *with* AT 331, 335.  On the other hand, when addressing plaintiff's
abilities to lift and carry, Dr. Pocha indicated in a medical source statement
that plaintiff should be limited to lifting and/or carrying ten pounds or less.  AT
332.  ALJ Stephan, in contrast, concluded that plaintiff could lift twenty
pounds.[32]  AT 23.

   The ALJ's RFC findings are remarkably similar to those recorded in an
assessment completed by an unknown individual who, unlike Dr. Pocha, did
not examine the plaintiff.  That assessment suggests that plaintiff has the
ability to lift and/or carry up to twenty pounds occasionally; to lift and/or carry
up to ten pounds frequently; and to stand and/or walk, and to sit, for about six

---

[32]     Earlier in his decision, the ALJ stated that he was giving Dr. Pocha's opinion
only "some weight" and explained that Dr. Pocha's opinion regarding plaintiff's ability to
lift and carry was based upon plaintiff's subjective complaints; was undermined by Dr.
Pocha's earlier opinion that plaintiff was only restricted from lifting "heavy" objects; and
was inconsistent with plaintiff's daily activities.  AT 20.

   I also note that the ALJ incorrectly stated that Dr. Pocha opined that plaintiff
"would be limited to lifting and carrying five pounds."  AT 20.  Dr. Pocha simply noted
in the medical source statement that plaintiff herself had stated that she could not lift
more than five pounds due to pain.  AT 333.  Dr. Pocha indicated by checking boxes
on the medical source statement that plaintiff could not lift and/or carry more than ten
pounds.  AT 332.

hours in an eight hour workday, with no limitations regarding the ability to push or pull.  AT 242.  Oddly, however, the ALJ did not discuss or even cite this RFC assessment in his decision.  It is therefore unclear whether the ALJ relied on this assessment in rendering his RFC determination.

In sum, I am uncertain as to what evidence the ALJ relied in making his RFC determination, inasmuch as it appears either that the ALJ did not rely on either of the two pieces of information contained in the record that specifically discuss plaintiff's exertional limitations or if he did, he did not specifically state as much in his decision.  *See* AT 241-248, 326-335.  Instead, it appears that the ALJ may have made his own RFC findings, in which case clear error was committed.  *See Zorilla*, 915 F.Supp. at 669 (ALJ's rejection of uncontested expert opinion in favor of his own conclusions constitutes legal error) (citing *McBrayer v. Sec. of Health & Human Servs.*, 712 F.2d 795, 799 (2d Cir. 1983); *Fiorello v. Heckler*, 725 F.2d 174, 176 (2d Cir. 1983)).

Moreover, while the ALJ engaged in a fairly detailed review of the medical evidence in his decision, it is well-settled that "[t]he RFC assessment must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (*e.g.*, laboratory findings) and nonmedical evidence (*e.g.* daily activities, observations)."  SSR 96-8p, 1996

47

WL 374184, at *7 (S.S.A.).  The Second Circuit has found that failure to specify the basis for a conclusion as to RFC is reason enough to vacate a decision of the Commissioner.  *Lecler v. Barnhart*, No. 01 Civ. 8659, 2002 WL 31548600, at *6 (S.D.N.Y. Nov. 14, 2002) (citing *White v. Sec. of Health & Human Servs.*, 910 F.2d 64, 65 (2d Cir. 2000) and *Ferraris*, 728 F.2d at 586-88).  Moreover, remand is appropriate where the reviewing court is unable to discern the Commissioner's rationale in relation to the evidence in the record without further findings or explanation for the decision.  *Sobolewski*, 985 F.Supp. at 314 (citations omitted).  In this instance, the ALJ failed to provide a narrative discussion describing how the evidence supports his conclusory RFC finding, thus providing a basis for remand.  *See id.*  The ALJ also failed to discuss all of plaintiff's exertional limitations, omitting any discussion regarding whether plaintiff's abilities to carry, push, pull, reach, and handle are limited.  The regulations provide that a claimant's RFC indicates the claimant's ability to walk, stand, lift, carry, push, pull, reach and handle.  20 C.F.R. § 404.1569a(b).  The ALJ's findings were therefore incomplete in this regard.

Based on the foregoing, the ALJ's determination that plaintiff has the physical capability to perform light work clearly is not supported by substantial

evidence.  I recommend that the matter be remanded to allow the ALJ to

develop the record with respect to plaintiff's ability to perform light work, and

specifically discuss whether plaintiff retains the RFC to perform all of the

physical requirements of work falling into that category, and to explain on

what medical evidence he relies in making that determination.

b.   Evaluation of Plaintiff's Mental Condition

When there is evidence of a mental impairment that allegedly prevents a

claimant from working, the Commissioner must follow a special procedure at

each level of administrative review.  *See* 20 C.F.R. §§ 404.1520a, 416.920a.

The Commissioner must first record the pertinent signs, symptoms, findings,

functional limitations, and effects of treatments contained in the record.  *Id.* §§

404.1520a(b)(1), 416.920a(b)(1).  If a mental impairment is determined to

exist, the Commissioner must next indicate whether certain medical findings

which have been found especially relevant to the ability to work are present or

absent.  *Id.* §§ 404.1520a(b)(2), 416.920a(b)(2).  In doing so the

Commissioner rates the degree of functional loss resulting from the

impairment – on a scale ranging from no limitation to severe limitation, the

latter of which is incompatible with the ability to do work-like functions –

analyzing four specific factors, including 1) activities of daily living; 2) social

49

functioning; 3) concentration, persistence, and pace; and 4) deterioration or decompensation in work or work-like settings. *Id.* §§ 404.1520a(c)(3), 416.920a(c)(3).

The Commissioner must then determine the severity of the mental impairment. 20 C.F.R. §§ 404.1520a(d), 416.920a(d). Where the Commissioner rates the degree of limitation in the first three functional areas as "none" or "mild", and "none" in the fourth functional area, the Commissioner will generally conclude that claimant's impairment is not severe, unless the evidence indicates otherwise. *Id.* §§ 404.1520a(d)(1), 416.920a(d)(1). If, on the other hand, the Commissioner finds the claimant's medical impairment to be severe, she must determine whether it meets or equals a listed mental disorder. *Id.* §§ 404.1520a(d)(2), 416.920a(d)(2). In the event the impairment is deemed severe, but does not meet or equal a listed mental disorder, the Commissioner next analyzes the claimant's RFC, considering whether he or she is limited in the ability to carry out certain mental activities – such as limitations in understanding, remembering, and carrying out instructions, and in responding appropriately to supervision, co-workers, and work pressures in a work setting – to such a degree as to reduce his or her ability to do past relevant work and other work. *See* 20

C.F.R. §§ 404.1520a(d)(3), 404.1545(c), 416.920a(d)(3), 416.945(c).

An ALJ is no longer required under the governing regulations to append a Psychiatric Review Technique Form ("PRTF") to his or her decision when addressing a case when a psychological impairment is implicated.  65 Fed. Reg. 50746-01 (Aug. 21, 2000), *available at* 2000 WL 1173632, at *50758. The ALJ is, however, nonetheless subject to the requirement that an analysis of whether a mental impairment exists be incorporated or in some way embodied within his or her decision when evidence of such an impairment is presented.  20 C.F.R. §§ 404.1520a.

To trigger these requirements a claimant bears the initial responsibility of providing medical evidence sufficient to indicate the potential existence of a mental impairment.  *Howell v. Sullivan*, 950 F.2d 343, 348 (7th Cir. 1991) (citing 20 C.F.R. §§ 404.1508, 404.1514).  In this case the record contains several reports documenting at least some degree of mental impairment in the plaintiff's case.  *See*, *e.g.*, AT 214-216, 217-221, 292-309, 310, 312-317. Since this initial requirement is satisfied, it was incumbent upon the ALJ to make an analysis of the effects of that mental impairment upon the various areas referenced in the pertinent regulations.

In his decision, ALJ Stephan appears to have concluded that plaintiff's

51

mental condition is of sufficient severity to qualify at step two of the relevant analysis, as an impairment of concern, but that it does not meet or equal any of the listed, presumptively disabling conditions set forth in the regulations. AT 22.  Plaintiff does not appear to challenge this portion of the ALJ's determination.

After reviewing the record and determining the extent of any limitations associated with plaintiff's physical conditions, the ALJ next turned to consider what, if any, impact plaintiff's mental condition would have upon her ability to perform work related activities.  AT 22-24.  The ALJ concluded that plaintiff is unable to return to her past relevant work as a claims analyst, as her mental impairment precludes performance of the detailed work required to perform that position.  AT 22.  The ALJ also found that plaintiff has "decreased concentration and difficulty dealing with people," *id.*, but yet plaintiff "has the ability to read and comprehend, perform simple rote tasks, and consistently understand and carry out simple instructions."  *Id.*  Accordingly, the ALJ determined that plaintiff retains the RFC "to perform simple, low stress work, which would not involve detailed or complex tasks, and work that does not involve constant contact with others."  AT 23.  ALJ Stephan noted that this conclusion was supported by the psychiatric evaluation conducted by Dr.

Annette Payne in April of 2002.[33]   *See* AT 23, 217-221.

Although the record discloses somewhat mixed findings regarding the extent of plaintiff's mental limitations, the ALJ's finding with respect to plaintiff's mental condition garners support from the record.  Plaintiff argues that there is no medical evidence to support the notion that she could "respond appropriately to supervision, coworkers, and usual work situations, and to deal with changes in a routine work setting."  Dkt. No. 9 at p. 22 (citing SSR 85-15).  The medical evidence, however, shows otherwise.

Upon plaintiff's discharge from Samaritan Hospital, Dr. Adrian Morris completed a psychiatric discharge summary on October 1, 2002.  AT 312-313.  Dr. Morris diagnosed plaintiff as suffering from major depression and assigned a global assessment of functioning ("GAF") of sixty.[34]  AT 312.  Thereafter, from October 2002 to June 2003, plaintiff was treated on an outpatient basis by health care providers at Samaritan Hospital.  AT 292-309.

---

[33]     While it is true that Dr. Payne observed that plaintiff has difficulties relating with others and will have difficulty dealing with normal stresses in a competitive workplace, she also opined that plaintiff was capable of making appropriate decisions.  AT 219-220.

[34]     The Global Assessment of Functioning ("GAF") scale considers psychological, social, and occupational functioning on a hypothetical continuum of mental health. Diagnostic and Statistical Manual of Mental Disorders 34 (American Psychiatric Association, 4th Ed. Text Revision 2000) ("DSM-IV-TR").  A GAF score of between 51 and 60 indicates the existence of moderate mental health symptoms or moderate difficulties in social, occupational or school functioning.  *Id.*

A progress note indicates that plaintiff was working to set good boundaries with family members and to take care of herself.  AT 300.

As was previously noted, the ALJ's RFC finding with respect to plaintiff's mental abilities finds support in a psychiatric evaluation conducted by Dr. Payne, on April 25, 2002.  AT 217-221.  As a result of her evaluation Dr. Payne found that plaintiff is capable of performing simple, rote tasks under supervision, and of learning new ones.  AT 220.  Dr. Payne did note that plaintiff has difficulties relating with others and with the normal stresses of a competitive workplace, but found that she is capable of making appropriate decisions and could benefit from vocational rehabilitation to identify jobs capable of being performed by her.  *Id.*  The evaluation of an independent consultant like Dr. Payne, despite constituting a non-treating source, can provide substantial evidence for an ALJ's determination.  *See Barringer v. Comm'r of Soc. Sec.,* 358 F.Supp.2d 67, 79 (N.D.N.Y. 2005) (Sharpe, J.).

Dr. Pocha's consultative report also supports the ALJ's finding.  Dr. Pocha noted that plaintiff has reported a history of depression and anxiety attacks.  AT 326.  Dr. Pocha concluded, however, that she "would not put any limitation on [plaintiff] secondary to her anxiety and depressive disorder as long as she can do any activity at her own pace."  AT 331.

The ALJ's finding also draws support from the RFC assessment rendered by non-examining State agency physician Dr. Arlene Reed-Delaney on May 28, 2002.  AT 223-240.  In that RFC assessment, Dr. Reed-Delaney indicated that plaintiff is "not significantly limited" with regard to the following abilities: to remember locations and work-like procedures; to understand, remember, and carry out very short and simple instructions; to sustain an ordinary routine without special supervision; to work in coordination with or proximity to others without being distracted by them; to make simple work-related decisions; complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; to ask simple questions or request assistance; to get along with coworkers or peers without distracting them or exhibiting behavioral extremes; to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness; to respond appropriately to changes in the work setting; to be aware of normal hazards and take appropriate precautions; and to travel in unfamiliar places or use public transportation.  AT 237-238.  Dr. Reed-Delaney also commented that plaintiff is able to perform "low contact work" and understand and follow simple directions, perform simple tasks, learn new

tasks, complete tasks independently, and relate to others appropriately.  AT 239-240.  Dr. Reed-Delaney further opined that while plaintiff has difficulties dealing with the normal stresses of a competitive workplace, she is only mildly to moderately limited by her psychiatric condition.  AT 239.

An ALJ is required to consider the RFC assessments rendered by State agency medical and psychological consultants in making a disability determination.  *See* 20 C.F.R. §§ 404.1512(b)(6), 404.1513(c), 404.1527(f)(2)(I), 416.912(b)(6), 416.913(c), 416.927(f)(2)(I).  State agency physicians are "highly qualified physicians . . . who are also experts in Social Security disability evaluation."  20 C.F.R. §§ 404.1527(f)(2)(I); 416.927(f)(2)(I); SSR 96-6p, 1996 WL 362203, at *2 (S.S.A.); *see also*, *e.g.*, *Brunson v. Barnhart*, No. 01-CV-1829, 2002 WL 393078, at *13-*15 (E.D.N.Y. Nov. 14, 2002).  The recorded opinions of Dr. Reed Delaney, were therefore properly construed by the ALJ, and provide substantial evidence to support his findings regarding plaintiff's mental capacity.

In sum, although the record contains somewhat mixed findings regarding plaintiff's mental limitations, the ALJ's finding that plaintiff retains the ability to perform simple, low stress work that does not involve detailed or complex tasks and that does not involve constant contact with people is

56

supported by substantial evidence.  Accordingly, I decline to recommend that the agency be directed to re-examine the mental limitation aspects of the ALJ's RFC finding upon remand.

3.     Use of Medical-Vocational Guidelines

Plaintiff argues that she suffers from nonexertional impairments including depression and anxiety, which significantly reduce the range of work available to her.[35]  Dkt. No. 9 at p. 23.  Plaintiff thus argues that the ALJ erroneously applied the grid, and instead should have obtained testimony from a vocational expert to determine what jobs exist in the national economy that plaintiff could perform given her impairments.  *Id.* at pp. 23-24.

In order to make the determination under the fifth step of the sequential analysis described above, the Commissioner uses the grid:

> In meeting [his] burden of proof on the fifth step of the sequential evaluation process . . . the Commissioner, under appropriate circumstances, may rely on the medical-vocational guidelines contained in 20 C.F.R. Part 404, Subpart P, App. 2 . . . . The Grid takes into account the claimant's residual functional capacity in conjunction with the claimant's age, education and work experience. Based on these factors, the Grid indicates whether the claimant can engage in any other substantial gainful work which exists in the national economy.

---

[35]     Nonexertional impairments can include depression and anxiety.  20 C.F.R. § 404.1569a (c)(1)(I).

> Generally the result listed in the Grid is dispositive
> on the issue of disability.

*Zorilla*, 915 F. Supp. at 667 (footnotes and citations omitted); *see also Rosa*,

168 F.3d at 78; *Perez*, 77 F.3d at 46.  The grid yields a decision of "disabled"

or "not disabled" taking into account the claimant's RFC, age, education, and

prior work experience.  20 C.F.R. § 404.1569. *See also* 20 C.F.R. Pt. 404,

Subpt. P, App. 2, 200.00 (a) (2004).

Generally, the result listed in the grid is dispositive on the issue of

disability.  *Zorilla*, 915 F. Supp. at 667.  Exclusive reliance on the grid,

however, "is inappropriate where the medical-vocational guidelines fail to

accurately describe a claimant's particular limitations."  *Id.* (citing 20 C.F.R.

Part 404, Subpart P, App. 2, § 200.00(e); *Crean v. Sullivan*, Civ. No. 91-7038,

1992 WL 183421, at *4 (S.D.N.Y. July 22, 1992)).

> For example, sole reliance on the Grid may be
> precluded where the claimant's exertional
> impairments are compounded by significant
> nonexertional impairments that limit the range of
> sedentary work that the claimant can performThis is
> also the case where there is not substantial
> evidence that a claimant can perform a full
> exertional range of work.

*Zorilla*, 915 F.Supp. at 667 (footnote and internal citations omitted) (citing,

*inter alia*, *Nelson v. Bowen*, 882 F.2d 45, 49 (2d Cir.1989) (individual

assessment required where there is insufficient proof that a claimant can perform a full range of sedentary work)).

In this instance, it is not sufficient for plaintiff to merely allege that a significant nonexertional impairment exists; in order for the grid to be inapplicable, plaintiff's depression and anxiety must be significant and limit the range of light work that she could perform.  20 C.F.R. Part 404, Subpart P, App. 2, §§ 200.00(e)(2), 201.00(h); *see also Bapp*, 802 F.2d 605; *Crean*, 1992 WL 183421, at \*4-\*5.  "By use of the phrase 'significantly diminish' we mean the additional loss of work capacity beyond a negligible one or, in other words, one that so narrows a claimant's possible range of work as to deprive him of a meaningful employment opportunity."  *Bapp*, 802 F.2d at 606.

The ALJ found that plaintiff retains the RFC "to perform simple, low stress work which does not involve constant contact with others, which work exists in significant numbers in the national economy."  AT 23.  The ALJ also noted that plaintiff was limited to work that does not involve detailed or complex tasks.[36]  AT 22-23.  The ALJ referred to the grid and concluded that,

---

[36]     The ALJ's findings regarding this point are somewhat confusing.  The ALJ discussed at some length plaintiff's inability to perform detailed work because "the performance of such work could exacerbate her mental impairment."  AT 22.  It appears, however, that he may not have included this restriction in his final analysis since it is not specifically mentioned in his final analysis while the other restriction, discerned – that plaintiff perform only low stress work that does not require constant

in spite of plaintiff's restrictions, such work "exists in significant numbers in the national economy." AT 24. The ALJ thus determined that plaintiff was not disabled under the meaning of the Act. *Id.*

Given the ALJ's finding that plaintiff's mental impairment prevented her from returning to her past relevant work because it involved detailed tasks, and also acknowledged that due to her anxiety she was limited to work that does not involve constant contact with people, he concluded that she cannot perform a full exertional range of work. Recalling that it is the Commissioner who bears the burden at step five of the sequential analysis, I find that the ALJ therefore should have elicited the testimony of a vocational expert to ascertain whether the national economy provided substantial gainful work that plaintiff could perform with her nonexertional impairments, which he failed to do. *See Zorilla*, 915 F.Supp. at 667 (noting that sole reliance on the grid may be precluded where there is not substantial evidence that a claimant can perform a full exertional range of work) (quotations and citations omitted). Accordingly, I recommend that the matter be remanded to the agency for further consideration of whether there are available jobs which the plaintiff is capable of performing. *See Burgos v. Barnhart*, No. 01 Civ. 10032, 2003 WL

---

contact with others – is specifically mentioned. *See* AT 24-25.

21983808, at *19 (S.D.N.Y. Aug. 20, 2003) (remanding where ALJ found that due to significant nonexertional impairments the plaintiff could not be exposed to respiratory irritants and could only perform simple repetitive tasks but failed to obtain testimony from vocational expert as to whether, in fact, the national economy provided substantial gainful work that the plaintiff was capable of performing with those particular nonexertional impairments); *Gallivan v. Apfel*, 88 F.Supp.2d 92, 99 (W.D.N.Y. 2000) (finding that where the plaintiff's nonexertional impairments significantly limited range of work, and ALJ "conceded" that the nonexertional impairments interfere with plaintiff's ability to work, ALJ should have introduced testimony from a vocational expert or received other evidence to ascertain whether jobs existed in the national economy).  Upon remand, the ALJ should adduce the testimony of a vocational expert or receive other evidence, apart from the grid, regarding the existence of jobs in the national economy for an individual with plaintiff's nonexertional impairments.

IV.   <u>SUMMARY AND RECOMMENDATION</u>

In arriving at his determination of no disability, the ALJ improperly discounted plaintiff's subjective complaints and overlooked his obligation to develop plaintiff's medical history, failing to obtain information from plaintiff's

chiropractor regarding treatment of her musculoskeletal impairments.   The

ALJ's credibility determination was therefore not supported by substantial

evidence.  The ALJ also failed to discuss what evidence supported his

conclusory finding as to plaintiff's ability to perform the exertional

requirements of light work, and was also duty bound to develop the record as

to this issue; thus, his determination was not supported by substantial

evidence.  Finally, the ALJ erred in relying on the grid to determine disability,

and failing instead to elicit the testimony of a vocational expert to ascertain

whether the national economy provides substantial gainful work that an

individual with plaintiff's combination of exertional and nonexertional

impairments can perform.  In light of these errors, the matter should be

remanded to the agency for further consideration.

Based on the foregoing it is

RECOMMENDED that plaintiff's motion for judgment on the pleadings

be GRANTED, the Commissioner's determination of no disability VACATED,

and the matter REMANDED to the agency for further consideration pursuant

to sentence four of 42 U.S.C. § 405(g).

NOTICE: Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge

written objections to the foregoing report. Such objections shall be filed with

the Clerk of the Court within ten (10) days.   FAILURE TO SO OBJECT TO

THIS REPORT WILL PRECLUDE APPELLATE REVIEW.   28 U.S.C. §

636(b)(1); Fed. R. Civ. P. 6(a), 6(e), 72; *Roland v. Racette*, 984 F.2d 85 (2d

Cir. 1993).

     IT IS FURTHER ORDERED, that the Clerk of the Court serve a copy of

this Report and Recommendation upon the parties in accordance with this

court's local rules.

Dated:     February 27, 2007
            Syracuse, NY

David E. Peebles
U.S. Magistrate Judge

G:\prisoner\peartoriginal.wpd

63